IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DAWNN MCCLEARY-EVANS,

    *Plaintiff*,

    v.

MARYLAND DEPARTMENT OF
TRANSPORTATION, MARYLAND
TRANSIT ADMINISTRATION,

    *Defendants*.

Civil Action No. ELH-12-1550

## MEMORANDUM OPINION

In May 2012, plaintiff Dawnn McCleary-Evans filed suit against her former employers, the Maryland Department of Transportation ("MDOT") and the Maryland Transit Administration ("MTA"), a unit within MDOT, alleging employment discrimination on the basis of race, sex, retaliation, age, and disability. ECF 1 ("Complaint"). Plaintiff's claims are rooted in the elimination of her job position during the State of Maryland's budget cuts for the 2010 fiscal year. Plaintiff claimed violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e *et seq*.; Title I of the Americans with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. §§ 12101-12113; and the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621-634 ("ADEA"). ECF 1 at 1-2, 12 ¶ 38.

In plaintiff's Amended Complaint, filed in March 2014 (ECF 31, "Amended Complaint"), plaintiff changed the basis of her ADA claim from Title I to Title II of the ADA, codified at 42 U.S.C. §§ 12131-12133. ECF 31 at 1-2. She also added claims under Section 504 of the Rehabilitation Act of 1973 ("Rehab. Act"), as amended, 29 U.S.C. §§ 791-794, and the

Maryland Fair Employment Practices Act, Md. Code (2009), § 20-606(a)(1)(i) of the State Government Article, based on the same alleged discriminatory conduct.

The case was stayed during the pendency of the appeal of a related action, *McCray v. Maryland Dep't of Transp.*, ELH-11-03732.  *See* ECF 12, 13, 19, 20, 23 (Order entered 6/24/13). The Fourth Circuit decided *McCray* on January 30, 2014.  Thereafter, defendant filed a Motion to Dismiss the Amended Complaint.  ECF 33 ("Motion").[1]  Plaintiff filed an Opposition (ECF 44), with exhibits (ECF 44-1 to ECF 44-3).  Defendants replied.  ECF 45.

The Motion has been fully briefed, and no hearing is necessary to resolve it.  *See* Local Rule 105.6.  For the reasons that follow, I will convert the Motion, in part, to a motion for summary judgment.  Pursuant to Fed. R. Civ. P. 12(b)(1), I will dismiss for lack of subject matter jurisdiction plaintiff's ADEA claims and her Title VII claim, for discriminatory transfer, that relates to actions taken before legislative activity began.  Pursuant to Fed. R. Civ. P. 56, I will deny plaintiff's discriminatory discharge claim under Title VII, the ADA, and the Rehab Act, as barred by legislative immunity, and deny plaintiff's remaining claims under the MFEPA, ADA, and the Rehab Act as time barred.  Therefore, I will grant the relief requested in the Motion.

## I.    Procedural Background

McCleary-Evans's case is related to three others filed in this District against the same defendants.  *See McCray v. Md. Dep't of Transp.*, ELH-11-03732; *Dale v. Md. Dep't of Transp.*, ELH-13-00191; *Walker-Pittman v. Md. Dep't of Transp.*, CCB-14-00202.[2]  All of the plaintiffs

---

[1] Plaintiff's "Motion for Leave to File Response to Defendant's Submission of April 26, 2013," is also pending.  *See* ECF 16.  Defendants have not opposed that motion.  I will grant the motion (ECF 16) and will consider the declarations attached to that motion as part of the record.

[2] McCleary-Evans also filed two other suits in this District, both alleging that State agencies failed to hire her due to race, sex, and/or age discrimination.  *See McCleary-Evans v.*

lost their jobs when Martin O'Malley, then the Governor of Maryland, with the approval of the Maryland Board of Public Works (the "Board"),[3] abolished plaintiffs' positions as part of State-wide budget cuts for fiscal year 2009 (McCray and Dale) and fiscal year 2010 (McCleary-Evans and Walker-Pittman).  In each case, the plaintiff is an African-American woman, over the age of forty.  Three out of the four cases also allege disabilities.  The plaintiffs are all represented by the same attorney.

The three other cases have already been decided at the district court level, each in favor of the defendants, and one, *McCray*, has been considered by the Fourth Circuit once, and by this Court a second time.  *See McCray*, 2013 WL 210186, at *1 (D. Md. Jan 16, 2013) ("*McCray I*"), *aff'd in part*, *vacated in part*, 741 F.3d 480 (4th Cir. 2014); *McCray*, 2014 WL 4660793 (D. Md. Sept. 16, 2014) ("*McCray II*"); *Dale*, 2015 WL 221628 (D. Md. Jan. 15, 2015); *Walker-Pittman*, 2015 WL 419806 (D. Md. Jan. 29, 2015).  *McCray II*, *Dale*, and *Walker-Pittman* are now pending on appeal before the Fourth Circuit.  *See McCray*, ELH-11-03732 (ECF 52) (Notice of Appeal); *Dale*, ELH-13-00191 (ECF 61) (same); *Walker-Pittman*, CCB-14-00202 (ECF 18) (same).

In each case, the district court held that defendants are entitled to absolute legislative immunity with respect to each plaintiff's claim for discriminatory discharge.  *See*, *e.g.*, *McCray*,

---

*Md. Dep't of Transp.*, CCB-13-00990, 2013 WL 5937735, at *1, 3 (D. Md. Nov. 5, 2013) (dismissing suit for failure to state a claim), *aff'd*, —F.3d —, No. 13-2488 (4th Cir. Mar. 13, 2015); *McCleary-Evans v. Md. Dep't of the Env't*, JKB-12-02928, 2013 WL 1890734, at *1 (D. Md. May 3, 2013) (dismissing suit for failure to file within ninety days of receipt of Right to Sue letter from EEOC).

[3] The Board is composed of the Governor, the State Comptroller, and the State Treasurer. *See* Md. Const. art. XII. It bears responsibility for supervising all public works in the State of Maryland. *See id.*

741 F.3d at 486; *Walker-Pittman*, 2015 WL 419806, at *3. However, in each case, including this one, the plaintiff also alleged (directly or indirectly) that she was transferred to a new position or given significantly different job duties, at defendants' behest, about a year or before the abolition of the position she held, and thus was not well positioned to withstand the budget cuts. *See* ECF 31 ¶ 27; *McCray*, 741 F.3d at 486; *Dale*, 2015 WL 221628, at *3; *Walker-Pittman*, 2015 WL 419806, at *4.

On appeal from my decision in *McCray I*, the Fourth Circuit determined in *McCray*, 741 F.3d at 486, that defendants' decision to change McCray's job duties before "any legislative activity began" was a discrete adverse employment action and was not subject to defendants' legislative immunity defense. It stated, *id.* (citations omitted):

> Had the legislature simply terminated McCray's position, that action would be shielded by legislative immunity. Similarly, if McCray's supervisors advised the legislature to terminate her position because of discriminatory animus, this too would be protected by legislative immunity. In this case, however, McCray's allegation is that she was subject to discriminatory adverse employment actions that made her position vulnerable to the budget cuts that eventually came, and she alleges that these actions were taken before any legislative activity. Put another way, the basis of McCray's lawsuit is not the financial storm that rocked the state and forced Maryland's government to scale back its budget. Rather, her claim is that the MTA and MDOT gave her a lightning rod to hold and sent her to the roof.

Accordingly, the Fourth Circuit affirmed in part and vacated in part my decision in *McCray I*. It held that defendants were entitled to legislative immunity with respect to McCray's claim for discriminatory discharge, but not as to an allegation that defendants were liable for her supervisor's discriminatory decision, before legislative activity began, to significantly change her job duties; the change in job duties allegedly rendered her job vulnerable to elimination when budget cuts were implemented. *Id.* The Court also concluded that McCray's motion under Fed. R. Civ. P. 56(d), seeking additional discovery in support of her opposition to the S.J. Motion,

"should have been granted because" her "lawsuit … aimed at discrimination that occurred before any legislative activity began." *Id*. at 487.  In addition, the Court held that McCray's ADEA and ADA Title I claims were barred by sovereign immunity. *Id*. at 483.

On remand, in *McCray II*, I dismissed McCray's remaining, pre-legislative activity claim because she failed to exhaust administrative remedies in her proceeding before the Equal Employment Opportunity Commission ("EEOC").  *McCray II*, 2014 WL 4660793, at *10-11.  I also dismissed her re-alleged ADEA claim, as barred by sovereign immunity, and her ADA Title II, Rehab Act, and MFEPA claims, as barred by statutes of limitations.  *Id*. at *8, *14-16. Similarly, in *Dale*, 2015 WL 221628, at *10-11, I held that Dale's ADEA claim was barred by sovereign immunity; that defendants were entitled to legislative immunity with respect to Dale's Title VII discriminatory discharge claim, *id.* at *17; that she had not timely filed EEOC charges as to any remaining Title VII claims, *id.* at *17-19; and that her MFEPA claims were also time barred. *Id*. at *19-20.

And, in *Walker-Pittman*, 2015 WL 419806, Judge Blake dismissed Walker-Pittman's claims for almost the same reasons.  Judge Blake dismissed plaintiff's ADEA and ADA Title I claims as barred by sovereign immunity, *id.* at *2; dismissed her Title VII discharge claim as barred by legislative immunity, *id.* at *4; dismissed any remaining Title VII claims for failure to timely file them before the EEOC, *id.* at *7, as well as failure to state a claim, *id.* at *8-9; and dismissed her ADA Title II claim as time barred.  *Id*. at *10.

## II. Factual Background[4]

### A. Plaintiff's Allegations of Discrimination

The MDOT is a "principal department" of the Maryland State government.  Md. Code (2008 Repl. Vol, 2012 Supp.), § 2-101 of the Transportation Article ("Transp.").  The MTA is one of nine statutorily created units, or "modal administrations," within the MDOT, *see* Transp. § 2-107(a)(3), and is responsible for administering the mass transit system in the Baltimore metropolitan area and other parts of the State of Maryland.  ECF 31 ¶ 5.  The Secretary of the MDOT, who is appointed by the Governor with the advice and consent of the State Senate, Transp. § 2-102(a), bears statutory responsibility for the budgets of the MDOT and each of its modal administrations.  *See* Transp. § 2-103(a).

Plaintiff describes herself as an "African American female."  *E.g.*, ECF 1 ¶ 4.  "At the time relevant to the allegations," she was fifty years old.  *Id.*  As of 2008, she had "suffered from degenerative arthritis of the knee" for more than ten years.  Decl. of Dawnn McCleary-Evans ("McCleary-Evans Decl."), ECF 14-1 ¶ 18.  Her condition "was partially disabling, limiting [her] capacity to perform certain physical tasks."  *Id.*

McCleary-Evans began working for defendants in July 2006, as an "Administrative IV, serving as Chief of Environmental Documents in the Office of Planning" ("Office").  *Id.* ¶ 2.  From July 2006 until October 8, 2008, McCleary-Evans "worked with a staff of in-house transportation planners and contract consultants as Chief of Environmental Documents to

---

[4] As stated, I am converting defendants' Motion to a motion for summary judgment, in part.  Accordingly, because all of plaintiff's claims will be decided under Fed. R. Civ. P. 12(b)(1), or under Fed. R. Civ. P.  56, I have considered and relied upon the entire record, including exhibits submitted by the parties in connection with the earlier summary judgment motion (ECF 9).

oversee the State's planning and development of federal documents in the area of environmental regulatory compliance … ." *Id.* ¶ 3.

Plaintiff avers that when she was hired in 2006 she "was the first African American female to hold a chief's position in the field of environmental regulation within the MTA's Office of Planning." *Id.* ¶ 4.  She succeeded "a White male, John Newton, who had left the position for work in the private sector." *Id.*   She claims that she had more experience in the field and better credentials than Newton. *Id.*

Newton returned to the Office of Planning in the Fall of 2006, "after an absence of just a few months in private industry … seeking to continue in his prior position." *Id.* ¶ 5.  The Office re-hired him as "another environmental chief within the Office of Planning." *Id.*   McCleary-Evans and Newton then "worked together as peers." *Id.*   However, plaintiff asserts that Newton immediately "assumed a domineering stance in his interpersonal dealings" with her, "as if he were then [her] supervisor." *Id.* ¶ 6.  Some months later, Newton became McCleary-Evans's direct supervisor:  "In or about April 2007," a "change of gubernatorial administrations from the administration of Governor Robert Ehrlich to that of Governor Martin O'Malley resulted in managerial changes within the Office of Planning." *Id.* ¶ 7.  "At some point after April 2007," Newton was promoted to serve as "Manager of Environmental Planning," in an acting capacity. *Id.* ¶ 8.  In this position, Newton served as McCleary-Evans's direct supervisor. *Id.*

McCleary-Evans maintains that "[t]hroughout [Newton's] return to the Office of Planning," Newton subjected her "to unprofessional and personally abusive treatment." *Id.* ¶ 9. On April 30, 2007, plaintiff submitted a memorandum detailing her concerns to Diane Ratcliff, a

white female, *id.* ¶ 3, and Director of the Office.  *Id.* ¶ 7.  *See also* ECF 14-2 (Memo of Apr.

2007).  She stated, ECF 14-2 at 1 (emphasis in original):

> Diane, I expressed to you my concerns about having to work with John Newton.
> In previous work encounters with him, he has been curt, unprofessional and often
> times down right rude.  One example of this kind of behavior occurred when you
> asked me to get some information from him about a project I was working on.  In
> almost every instance that I had to speak with him about a work related subject,
> he has exhibited, in my opinion inappropriate behavior.
>
> Also, when he has to seek information from me, he treats me in a non-
> professional manner.  For example, when he came to me about the quarterly
> updates.  When I wasn't forthcoming with what he wanted to hear, he abruptly
> turned and walked out.  I have only cited a few examples of this kind of behavior
> on his part, there are others.
>
> All of this negativity makes the working environment very tense.  I feel that his
> reactions are due to me being <u>an African –American as well as a female</u>.  I write
> to you because I want to make you aware of this situation as a matter of official
> record.

"On or about October 15, 2007, having received no response to her" April 2007

memorandum, McCleary-Evans sent a "follow-up memorandum" to Ratcliff, reiterating her

concerns with Newton.  McCleary-Evans Decl., ECF 14-1 ¶ 10; *see also* ECF 14-3 (Memo of

Oct. 2007).  She informed Ratcliff that she "intend[ed] to go to the 'Office of Fair Practice' for

advice concerning the continued negative treatment" she felt she was receiving from Newton.

ECF 14-3 at 1.  She added that Newton's "behavior towards [her] ha[d] been even more

pronounced" than when she wrote her last memorandum, and that "he ha[d] been irascible and

rude towards [her] concerning the files (as one example) … ."  *Id.*  Plaintiff did then consult with

defendants' internal Office of Fair Practice.  McCleary-Evans Decl., ECF 14-1 ¶¶ 11-12.  Soon

after, plaintiff received a written response from Ratcliff with respect to plaintiff's memos of

April and October 2007.  *Id.* ¶ 13.  Ratcliff "encouraged [plaintiff] to meet with Mr. Newton and work out a resolution to [plaintiff's] expressed concerns."  *Id.*

Despite three meetings intended to resolve the issue, ECF 14-1 ¶¶ 14, 17, the tension between McCleary-Evans and Newton in the workplace continued until October 2008, when plaintiff was transferred to a new position, in a different office.  *See id.* ¶¶ 14-24.  McCleary-Evans points to an incident involving plaintiff, Newton, and a contractor, which occurred on July 28, 2008.  *Id.* ¶ 19.  Plaintiff was scheduled to go on medical leave starting the next day, July 29, 2008, for knee surgery.  *Id.* ¶ 18.  She describes the incident as follows, *id.* ¶ 19:

> 19.  On or about July 28, 2008, I met with a contract consultant assigned to the Office of Planning who was then working with me.  This contract consultant is a White female.  I recall her name only as Megan.  During the course of my meeting with Megan, Mr. Newton rudely interrupted us to interject his unhappiness that the projects to which I had been assigned would be left for him to handle on his own during the period that I would be out on leave for my scheduled knee surgery.  Mr. Newton then became belligerent, screaming not only in my face but in Megan's face.  He bullied both of us until we were compelled to leave him, walking away, Megan in tears, to lodge complaints with Ms. Ratcliff about his behavior.  Ms. Ratcliff again took no action either to acknowledge or address the complaints lodged either by me or the female contract consultant.

According to McCleary-Evans, as a result of the incident, she experienced "asthmatic problems" that required her to reschedule her knee surgery, and to delay her medical leave.  *Id.* ¶¶ 20, 28.  She also learned that the Office terminated the contract of "Megan, the White female consultant" "[s]hortly following" the incident.  *Id.* ¶ 21.

About seven weeks later, McCleary-Evans was required to attend a meeting with Anthony Brown, "Deputy Administrator" at the MTA, in which she was told that she would be transferred to a new position in a different office within the MTA.  *Id.* ¶ 24.  She describes the meeting, and her interpretation of the decision, as follows, *id.* ¶¶ 24-26:

24.   On or about September 19, 2008, … I met with Mr. Brown.  He then told me that my skills were needed in the Office of Safety, Quality Assurance, and Risk Management ("Office of Safety") to oversee new environmental compliance issues presented by a recent suit by the Federal Environmental Protection Agency. He explained to me that I was to be transferred to the Office of Safety to perform Environmental Analyst IV duties.  *Mr. Brown explained that the transfer was not to be treated as a demotion, as I would retain my Administrative IV PIN and receive no change in pay.*  My new duties would be assumed effective October 8, 2008.  My transfer was handled in such a manner that the PIN for my position, even as I fulfilled duties in the Office of Safety, remained in the Office of Planning.

25.   Although he never mentioned Mr. Newton or my complaints regarding his treatment of me and his treatment of the contract consultant, Mr. Brown's transfer of me to the Office of Saftey took place within a short time of the incident, and I am aware of no other circumstance taking place more proximate to the transfer as would account for the decision but to get me away from Mr. Newton, not to address my complaints, but rather to protect and accommodate Mr. Newton's desire not to work with me.

McCleary-Evans adds that Brown transferred her to a position that required her to engage in activities she was "restricted from performing … by doctor's orders," such as driving "strenuous distances, walk[ing] in dangerous locations, and navigat[ing] hills and culverts with an arthritic knee."  ECF 14-1 ¶ 26.  According to plaintiff, he did so "[d]espite his awareness of" her degenerative arthritis of the knee and "its disabling impact upon" her.  *Id.*  She informed him of her condition in the meeting.  *Id.*  Plaintiff does not say when she learned her new position would require her to engage in these restricted activities.  *Id.*  Nor does plaintiff state whether she objected to the transfer, during the meeting or at any time afterwards.  *E.g.*, *id.*; ECF 1 ¶¶ 27-30.

In plaintiff's second declaration, filed in May 2014, after the Fourth Circuit's *McCray* decision, McCleary-Evans describes her reaction to the transfer as follows, McCleary-Evans Second Declaration, ECF 44-1 ¶ 7:[5]

> 7.   To the extent that it is my contention that decisions prior to the budgetary decision, including past reassignments … ultimately led to my being selected as a candidate whose position was to be eliminated, these prior assignments presented no adverse action to me until the eventual decision to use the assignment in selecting me to have my position eliminated.  At the time of the reassignment, I was in no position to complain, and, absent knowledge of event [sic] that had yet to play themselves out, no capacity to make any meaningful complaint until my reference to these actions in [an] October 5, 2009 interview with the EEOC intake investigator.

Plaintiff began her work in the Office of Safety on October 8, 2008.  McCleary-Evans Decl., ECF 14-1 ¶ 27.  She felt she was "effectively dumped in a new position without space to work, in an office having no work for her to perform, and with assigned duties outside of her" classification "as an Administrative IV."  *Id.*  She does not describe what she did in the Office of Safety, but she says that she "proceeded within the limitations of [her] physical condition until December 2008, when [she] took leave from work for knee surgery."  *Id.* ¶ 28.  She returned to work in February 2009, and continued to receive medical treatment and use periodic sick leave until August 2009.  *Id.*

On August 25, 2009, McCleary-Evans met with Simon Taylor, "Assistant to the MTA Administrator," who informed her that her position "would be abolished to address the State's budget crisis for FY 2010."  *Id.* ¶ 29.  Specifically, Taylor provided her with "a letter announcing

---

[5] Although plaintiff refers to "reassignments" in the plural form, it is not clear to the Court what additional reassignment or reassignments she is referring to, beyond her October 2008 transfer.

that the PIN[6] supporting [her] position in the Office of Planning was to be eliminated effective October 1, 2009 … ." *Id.* Defendants have submitted a copy of a memorandum dated August 25, 2009, and addressed to plaintiff, from Beverly K. Swaim-Staley, "Acting Secretary" of MDOT. *See* ECF 9-8 at 1.[7] The memorandum states, in relevant part:

Memorandum

TO:         Dawnn McCleary-Evans
            Maryland Transit Administration

FROM:       Beverley K. Swaim-Staley
            Acting Secretary

DATE:       August 25, 2009

RE:         Position Abolition

We regret to inform you that, due to budgetary constraints your position will be abolished on October 1, 2009.  Your separation from State service will be effective at the close of business on September 30, 2009.  Under section 11-302 of the State Personnel and Pensions Article, this action is not considered a layoff as it is the result of a budget action.

Regarding plaintiff's meeting with Taylor on August 25, 2009, plaintiff adds:  "I asked Mr. Taylor why I had been selected for elimination of my position, and his response did not address my specific question." McCleary-Evans Decl., ECF 14-1 ¶ 29.

---

[6] To the best of my knowledge, the parties have not defined a "PIN."  It appears to correspond to a unique number identifying a particular position.

[7] An affidavit from Cystale A. Dunham, an employee at the MTA whose job duties include "overseeing the operations of the Office of Human Resources and maintaining documents and other records related to personnel actions taken by the agency," states that the letter was "taken from the business records of MTA," and is a true and accurate copy.  ECF 9-6 at ¶¶ 2-3.  But, I cannot be sure it is the same letter provided to plaintiff at her meeting with Taylor on August 25, 2009.

### B. Abolition of Plaintiff's Position

Under Maryland Law, the General Assembly's appropriation for a job position with the State may be abolished in one of three ways: (1) the Governor may omit the position from the annual budget bill presented to the State legislature; (2) the General Assembly may strike an appropriation included in the budget bill presented by the Governor; or (3) the Governor, with approval of the Board, may reduce an appropriation previously included in the budget bill, as enacted. *See* 76 Md. Op. Atty. Gen. 330, 1991 WL 626528, at *1 (Sept. 5, 1991); *Judy v. Schaefer*, 331 Md. 239, 258-61, 627 A.2d 1039, 1049-50 (1993) (discussing Governor's authority to strike budget appropriations).

The third method identified above derives from Section 7-213(a) of the State Finance and Procurement Article ("SFP") of the Maryland Code (2009 Repl. Vol.).  Under that section, the Governor may, "with the approval of the Board of Public Works, . . . reduce, by not more than 25%, any appropriation: (1) that the Governor considers unnecessary; or (2) that is subject to budgetary reductions required under the budget bill as approved by the General Assembly."  *Id*. The position is then lost by operation of law, just as it would be if the action had been taken in the budget bill by the Governor and the General Assembly.  76 Md. Op. Atty. Gen. 330, 1991 WL 626528 at *5.

In August 2009, cuts to the State's fiscal year 2010 budget were announced by the Governor and the Board using this third method.  *See* Press Release, "Budget Reductions Before the Board of Public Works" (August 26, 2009), ECF 9-3.  Plaintiff does not dispute that her position was abolished as part of these budget cuts. *See*, *e.g.*, ECF 1 ¶ 39 ("… Defendant Employer proceeded to target Plaintiff by unreasonably assigning her to another position, … for

her subsequent removal from her position as a result of a decision to eliminate the position to which she came to be assigned for budgetary reasons."); Opposition to M.S.J., ECF 14 at 5 ("On the basis of … [defendants' decision to eliminate plaintiff's job], Plaintiff's position would be abolished to address the State's budget crisis for FY 2010."); Opposition to Motion, ECF 44 at 1-2 ("… Plaintiff's discrimination claims arising as a consequence of the elimination of her position is not necessarily barred by legislative immunity along [sic] as the focus of the alleged discrimination relates to actions prior to the budgetary decision.").

Moreover, plaintiff submitted a table showing the "Positions Abolished" inside the MTA in "FY2010," and, *inter alia*, the names of the "Prior Incumbent" of each position. ECF 14-17 ("MTA Job Cuts Table"). In her Declaration, plaintiff explains that the table is a true and accurate copy of a "document secured from … EEOC materials." McCleary-Evans Decl. ¶ 46. Plaintiff's name, and prior position, is on the list. ECF 14-17.[8]

Wonza Spann-Nicholas, Deputy Chief Financial Officer for MDOT, asserts that MDOT's budget cut recommendations were compiled upon recommendation from "its modal administrations." Affidavit of Wonza Spann-Nicholas ("Spann-Nicholas Aff."), ECF 9-9 ¶¶ 3-5. Wonza states: "In the summer of 2009, MDOT directed its modal administrations, including the [MTA], to identify cost saving measures to assist the State in balancing its budget. MDOT received recommendations, including recommended job position reductions, from its modal administrations." Spann-Nicholas Aff., ECF 9-9 ¶ 3. After reviewing the recommendations,

---

[8] Defendants submitted a copy of a similar table, with an Affidavit from Cystale A. Dunham ("Dunham Aff."), authenticating the document. *See* ECF 9-7 (table); ECF 9-6 (Dunham Aff.). The table submitted by defendants also reflects that a job with the title of "Administrator IV," filled by plaintiff, and with the "Essential Function" of "Safety Claims Mgt," *see* ECF 9-7, was on the MTA's "final list of proposed eliminations for fiscal year 2010 provided to the" MDOT. *See* ECF 9-6 ¶ 3(a).

MDOT sent a final list of "recommended position abolishments" to the Maryland Department of Budget and Management." *Id*. MDOT presented its recommendations to the Office of the Governor on August 17, 2009. *Id*. ¶ 4.

Spann-Nicholas attached to her Affidavit a document she states is the "[f]inal list of recommended PIN abolishments for MDOT and its modal administrations forwarded to the Maryland Department of Budget & Management." Spann-Nicholas, ECF 9-9 ¶ 5; *see also* ECF 9-10 ("MDOT Job Cuts Table").[9] Summaries at the end of the MDOT Job Cuts Table show that MDOT recommended sixty-six full-time positions for abolition. ECF 9-10 at 4. Forty-four of the positions were vacant, and twenty-two (and a half) were filled when cut. *Id*. One of the filled positions, identified as an "Administrator IV" with an "Essential Function" as "Safety Claims Mgt," is listed as belonging to plaintiff. *Id*. at 3.[10]

Anthony Brown, the same MTA administrator who informed plaintiff of her transfer to the Office of Safety, *see* McCleary-Evans Decl., ECF 14-1 ¶ 44, states in an affidavit submitted by defendants that he personally identified plaintiff's "job function" for elimination on behalf of MTA. Affidavit of Anthony Brown ("A. Brown Aff."), ECF 9-5 ¶ 5. In particular, he states: "MTA senior management was tasked with identifying potential job functions that could be

---

[9] Spann-Nicholas, Deputy Chief Financial Officer, states that she is "responsible for maintaining documents related to budgetary actions affecting MDOT and its modal administrations," and authenticates the MDOT Job Cuts Table in her Affidavit. ECF 9-9 ¶¶ 2-5.

[10] Defendants have also provided a twenty-page "Summary of August 2009 BPW Reductions" ("Budget Summary") dated August 25, 2009, which includes brief summaries of every item cut from the fiscal year 2010 State budget, totaling more than $454 million in sum. ECF 9-4 at 20. The Budget Summary shows that a total of 363.5 full-time jobs were abolished by the fiscal year 2010 State budget cuts. *Id*. It affirms that some sixty-six of those were cut from the MDOT. *Id*. at 19. It does not further detail which positions were cut at MDOT. *Id*.

eliminated.  One of the job functions I identified for potential elimination was an Administrator

IV position in the Office of Safety, Quality Assurance, and Risk Management.  This position was

filled at the time by Dawnn McCleary-Evans." *Id*.[11]

Plaintiff's last day of work at MTA was September 30, 2009.  McCleary-Evans Decl.,

ECF 14-1 ¶ 30.

### C. Proceedings Before the EEOC

Days later, on October 5, 2009, McCleary-Evans "appeared for an intake interview with"

the EEOC "to commence the process of filing a discrimination charge … ."  *Id*. ¶ 31.  She

submitted an intake questionnaire the same day.  *Id*.; *see also* ECF 15-2 at 1-5 ("Intake

Questionnaire").  She indicated, by checking boxes, that she had been discriminated against on

the basis of race and sex, and that defendants retaliated against her for engaging in activity

protected by Title VII.  ECF 15-2 at 2.

It appears that, on October 20, 2009, the EEOC provided defendants with notice that a

charge of discrimination had been filed against them on October 5, 2009, the date when plaintiff

submitted her Intake Questionnaire to the EEOC.  *See* ECF 14-19 at 8 ("Notice of Charge of

Discrimination," addressed to Paula Cullings at the MTA, from the EEOC, dated Oct. 20, 2009)

(hereinafter, "Notice").    The Notice stated that on "October 5, 2009, EEOC received

---

[11]  In her first Declaration, McCleary-Evans disputes Brown's assertion, just described,
that he identified a job function in the Office of Safety for elimination.  McCleary-Evans Decl.,
ECF 14-1 ¶ 43.  She argues that the job function identified was actually in the Office of
Planning, because she still had the "PIN" for Administrator IV, corresponding to her former job
in the Office of Planning, while she worked in the Office of Safety.  *Id*. ¶ 44.  She argues the
PIN/title corresponding to her actual job function in the Office of Safety was "Environmental
Analyst IV."  *Id*.  The MDOT Job Cuts Table provided by defendants, however, shows that they
recommended for elimination a position called "Administrator IV," with the "Essential
Function" of "Safety Claims Mgmt.," filled by plaintiff.  ECF 9-10 at 3.

documentation constituting a minimally sufficient charge of discrimination."   *Id*.   It indicated that discrimination was alleged on the basis of race, sex, and retaliation, and provided defendants with plaintiff's name as the charge-filer.   *Id*.   It did not further describe the charge allegations, but said that "a perfected charge will be forwarded to you for a complete response" within "45-60 days."   *Id*.   However, plaintiff did not finalize her "perfected charge" until February, 2011.

McCleary-Evans has submitted documents showing that she engaged in an extended exchange of information with the EEOC before finalizing her Charge of Discrimination.   She has included a memorandum, addressed to EEOC investigator Nicole Chandler, dated June 2, 2010, in which she stated:   "As per my phone interview with you on May 19, 2010, we discuss [sic] possibly removing **'Race and Sex'** from my initial 'Intake Questionnaire'.   However, after going through my employment material, I have decided to keep **'Race and Sex'** in the initial investigation of my complaint."   ECF 16-2 at 2 (emphasis in original); *see also* ECF 16-2 at 3 (listing additional documents submitted by plaintiff to Chandler that day).   Plaintiff also stated that she wanted to amend her complaint to include age-based discrimination, and that she would be sending Chandler more information.   ECF 16-2 at 2.

On June 9, 2010, plaintiff provided Chandler with a second round of additional information, in the form of "copies of memos and e-mails." *Id*. at 4.   She included a summary of facts elaborating on Newton's alleged discriminatory behavior, dating from April 30, 2007, through December 31, 2007.   *Id*. at 5-6, 17.

A third memorandum to Chandler, dated June 18, 2010, referred to plaintiff's submission of a third round of additional information, described as a thirty-eight page packet consisting of "copies of memos, e-mails, forms, policies, announcements, etc."   ECF 16-2 at 7.   Plaintiff

attached to the memorandum another summary of facts, dating from January 2008 through June 2010. *Id.* at 8-15.

On June 21, 2010, plaintiff sent what appears to be her fourth and final memorandum to Chandler. *Id.* at 18. Plaintiff stated that she "believe[d] there were issues of disability discrimination," and that she wanted to amend her complaint and add "Disability." *Id.*

The EEOC sent plaintiff a proposed Charge of Discrimination on January 20, 2011. *See* ECF 44-2 at 1-2 (letter from EEOC to plaintiff, dated Jan. 20, 2011, enclosing proposed charge, with instructions for finalizing). Plaintiff signed her formal EEOC Charge of Discrimination ("EEOC Charge") on February 14, 2011. *See* ECF 44-2.[12] In the EEOC Charge, plaintiff checked race, sex, retaliation, age, and disability as the bases for defendants' alleged discrimination. *Id.* Of import here, plaintiff specified August 25, 2009, as the date (earliest and latest) that discrimination took place. *Id.*

The EEOC Charge "particulars" state as follows, *id.*:

> I.     I began working for the above named employer in July 2006 as an Administrator IV. On or about August 25, 2009, I was informed that my position would be abolished effective October 1, 2009. Several black female employees over the age of 40 (Helen Dale, Adrianne Walker-Pittman, Ardnetta Clark-Scott, Sheila Epps, Marie McCray and Margaret Washington) had their positions abolished during the same relevant period.
>
> II.    The employer stated my position was abolished because of budgetary constraints.
>
> III.   I believe I have been discriminated against because of my race (Black), sex (female), retaliation, age (50), and disability in violation of Title VII of the Civil Rights Acts of 1964, as amended; the Age Discrimination in Employment Act of 1967, as amended; and the

---

[12] This copy was filed by plaintiff. Defendants also submitted an identical, authenticated copy at ECF 9-15 (EEOC Charge). *See also* ECF 9-12 (authenticating Affidavit of Cullings).

Americans with Disabilities Act Amendments Act of 2008; respectively.

IV.    I also believe Black females over the age of 40, as a class, have been discriminated against because of their race, sex and age in violation [of] Title VII of the Civil Rights Acts of 1964, as amended; and the Age Discrimination in Employment Act of 1967, as amended.

On February 24, 2012, the EEOC sent plaintiff notice that it was closing its investigation of her case, and that she had the right to file suit in federal or state court within ninety days of her receipt of the notice.  *See* ECF 14-19 (letter) at 6.

**D. Procedural History & Plaintiff's Requests for Additional Discovery**

Plaintiff filed suit in this Court on May 23, 2012.  ECF 1.  On January 15, 2013, in response to plaintiff's Complaint, defendants filed a "Motion to Dismiss, or in the Alternative, Motion for Summary Judgment."  *See* ECF 9 ("S.J. Motion").  Defendants also filed seven exhibits with six attachments, including many of the documents discussed above.  Plaintiff opposed the S.J. Motion (ECF 14, "Opposition to S.J. Motion"), and submitted nineteen exhibits and attachments.  *See* ECF 14-1 through ECF 14-19.  Defendants filed a Reply.  ECF 15. Notably, in a Declaration filed with her Opposition (McCleary-Evans Decl., ECF 14-1), plaintiff averred that defendants' S.J. Motion was premature, as she needed additional discovery to justify her Opposition.  McCleary-Evans Decl., ECF 14-1 ¶¶ 47-48.  Specifically, she stated that she needed "adversarial pretrial discovery" in order to demonstrate that "the making of personnel decisions before budgetary cuts were effected" in relation to her own position and those of others similarly situated "(1) were beyond any budgetary implication and (2) were driven by the unlawful bias of some decision maker whose made [sic] decisions are apparent in the pattern presented."  *Id.* ¶ 47.

Soon after defendants filed their S.J. Motion in this case, I granted defendants' Motion to Dismiss in the related case of *McCray v. Md. Dep't of Transp.*, ELH-11-03732, 2013 WL 210186 (D. Md. Jan 16, 2013) ("*McCray I*").  McCray filed a Notice of Appeal on February 14, 2013.  *See McCray*, ELH-11-03732 (ECF 23).  On February 19, 2013, McCleary-Evans sought a stay of this case, pending the outcome of the appeal in *McCray*.  ECF 12.  Initially, I denied that request.  *See* ECF 13.  But, for the reasons stated in ECF 19, I later indicated that I would reconsider a motion to stay.  On June 7, 2013, McCleary-Evans filed another motion to stay this case, pending resolution of McCray's appeal.  *See* ECF 20.  I granted plaintiff's motion.  *See* ECF 23 (Order).

The Fourth Circuit decided McCray's appeal on January 30, 2014.  *See McCray*, 741 F.3d 480.  As discussed, the Court affirmed in part and reversed in part my decision in *McCray I.* In light of the Fourth Circuit's holding in *McCray*, McCleary-Evans moved, on March 7, 2014, to amend her complaint.  ECF 29 (Motion to Amend).  I granted that motion on March 25, 2014. ECF 30 (Order).  Plaintiff filed her Amended Complaint on the same day, ECF 31, rendering moot defendants' S.J. Motion.  *See* ECF 46 (Order).  Defendants subsequently filed the pending Motion.  *See* ECF 33.

On November 13, 2014, I notified the parties that I intended to convert defendants' motion to dismiss (ECF 33) into a motion for summary judgment.  *See* ECF 46.  However, I invited the parties to challenge my proposal and to "submit any additional evidence they believe the Court should consider in ruling on the Motion."  *Id*. at 2.  In response, plaintiff opposed the proposed conversion and submitted two additional declarations touching on her Title VII claims: one from plaintiff's attorney, John H. Morris, Jr., Esq., supplementing a prior submission

("Morris Decl. Supp.," ECF 47-1); and one from Charles Brown, a former MTA employee ("C. Brown Decl.," ECF 51-1).

Mr. Morris's Supplemental Declaration is a Rule 56(d) affidavit, submitted to "set forth the need" of plaintiff "for further discovery." ECF 47-1, Morris Decl. Supp. ¶ 5. He relies, in turn, on the "recollections of Mr. Brown," as stated in the C. Brown Decl., discussed *infra*, to support the existence of certain "factual questions in need of further factual discovery." *Id*. ¶ 14.[13] Among other reasons, Morris asserts the need for discovery "to develop the following … areas of inquiry," *id.* ¶ 14(b):

> (1) the circumstances surrounding, and the prevailing motivations regarding, the respective plaintiffs' shifts in assignment and duties during the months prior to the identification of their positions for elimination; (2) the existence of a long-term desire among supervisory officials of Defendant to terminate Ms. Dale and Ms. McCleary-Evans for reasons unrelated to budgetary concerns[;] (3) official hesitation to proceed on any such identified desires to terminate these two women; (4) evidence connecting in any way (i) any prior motivation to terminate Ms. Dale and Ms. McCleary-Evans, (ii) the position transfers or reassignments that both women experienced months before the elimination of the positions they came to fill, (iii) the availability of the budget process to realize these such identified earlier desires to terminate the employment of the women, and (iv) such unlawful discriminatory or retaliatory motivations present in MTA officials related in any way to the budgetary decision-making and he [sic] earlier personnel decisions.

Morris also set forth his view that discovery is needed to uncover other "relevant information" of the kind "that no attorney could now describe or articulate that would be uncovered in the pursuit of the matters previously described leading to other evidence supporting" McCleary-Evans's claims. *Id*. ¶ 14(c).

---

[13] Morris submitted identical declarations in this case and in *Dale*. *See Dale*, ELH-13-00191 (ECF 50-2). Therefore, Morris refers to both Dale and McCleary-Evans in his statements.

In the Declaration of Charles Brown, Mr. Brown challenges certain factual assertions made by former MTA administrator Anthony Brown in his affidavit submitted by defendants, discussed *supra*.  *See* A. Brown Decl., ECF 9-5.  Charles Brown alleges two relevant bases of knowledge.  First, he states that he worked at the MTA, beginning in or about November 1989, and continuing until October 2008.  C. Brown Decl. ¶¶ 2, 5, ECF 51-1.  From his hiring in 1989 through at least 2007, he worked as an "Equal Employment Opportunity Officer III."  *Id.* ¶ 2. Through his work with the MTA and through activities with the "Maryland Chapter of the Conference of Minority Transportation Officials and some community-uplift projects," Charles Brown came to "personally know" both Anthony Brown and "the position that [Anthony Brown] held" at the MTA.  *Id.* ¶ 11.  Second, Charles Brown asserts he is an expert in the field of human resources.  He briefly described other positions he held in the field before joining MTA, and stated that his "background in human resources" qualifies him "to render comment as a person with expert knowledge upon the conduct of reductions in force such as the one attempted in this instance by the MTA."  *Id.* ¶ 7.

Based on Charles Brown's personal knowledge of Anthony Brown and Anthony Brown's position at the MTA, coupled with his own alleged expertise in human resources, Charles Brown argues that certain statements made by Anthony Brown appear to be "very irregular."  *Id*. ¶ 11. Specifically, Charles Brown asserts that the "participation" of Anthony Brown, a high-level MTA administrator, "as the individual identifying specific positions [for elimination] was very irregular."  *Id.*  Further, Charles Brown argues that such decisions are usually made by more subordinate managers, because they have "immediate knowledge and responsibility to accomplish the employer's mission with diminished staff."  *Id*. ¶ 9.

Defendants submitted a response to plaintiff's supplemental declarations.  ECF 55.

Additional facts are included in the Discussion.

### III. Standard of Review

### A. Fed. R. Civ. P. 12(b)(1)

Defendants' Motion is premised in part on Fed. R. Civ. P. 12(b)(1).  "It is well established that before a federal court can decide the merits of a claim, the claim must invoke the jurisdiction of the court."  *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006).  "[J]urisdiction goes to the very power of the Court to act."  *Ellenbury v. Spartan Motors Chassis, Inc.*, 519 F.3d 192, 196 (4th Cir. 2008).  Moreover, "[c]ourts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it."  *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010).  Pursuant to Fed. R. Civ. P. 12(h)(3), "the court must dismiss the action" if "at any time" it determines that it lacks subject matter jurisdiction.  *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506-07 (2006).

A test of subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge, asserting that the allegations pleaded in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting "'that the jurisdictional allegations of the complaint [are] not true,'" or that other facts, outside the four corners of the complaint, preclude the exercise of subject matter jurisdiction.  *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009) (citation omitted); *see also Buchanan v. Consol. Stores Corp.*, 125 F. Supp. 2d 730, 736 (D. Md. 2001).

Defendants bring a facial challenge to McCleary-Evans's ADEA claims.  They argue that this Court lacks subject matter jurisdiction because defendants are entitled to sovereign

immunity.  *See* ECF 33-1, Memo at 7.  In a facial challenge, such as this, "the facts alleged in the complaint are taken as true" and, "if the complaint alleges sufficient facts to invoke subject matter jurisdiction," then the motion must be denied.  *Kerns*, 585 F.3d at 192.  Defendants bring a factual challenge[14] to McCleary-Evans's Title VII claims that, they argue, were not included in the EEOC Charge, were not exhausted administratively, and, therefore, are not properly before this Court.  ECF 33-1 at 13-15.

### B. Conversion of Remainder of Motion Under Fed. R. Civ. P. 12(d)

Defendants' Motion is also premised in part on Fed. R. Civ. P. 12(b)(6).  A motion under Rule 12(b)(6) permits a defendant to test the sufficiency of a complaint.  *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  In considering a Rule 12(b)(6) motion, the court "must accept as true all of the factual allegations contained in the complaint," and must "draw all reasonable inferences [from those facts] in favor of the plaintiff."  *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, *Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations and quotations omitted); *see also*, *e.g.*, *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011) (stating that courts must construe the facts "in the light most favorable to the nonmoving party"), *cert. denied*, — U.S. —, 132 S. Ct. 402 (2011).

Plaintiff submitted exhibits for my consideration in connection with the pending Motion.  *See* ECF 44-1 (McCleary-Evans Second Decl.); ECF 44-2 (copy of EEOC Charge); ECF 44-3 (copy of Position Statement submitted by defendants to EEOC during EEOC investigation).

---

[14] Courts commonly consider EEOC Charges as integral to a plaintiff's Complaint, even if the EEOC Charge is not filed with the Complaint.  Thus, this might also be considered a facial challenge.  In any event, the distinction is not material here, because, as stated, I notified the parties that I intended to convert the Motion to one for summary judgment and invited the parties to submit any evidence they deem relevant to the arguments in the Motion.

Defendants also submitted a copy of plaintiff's EEOC Charge.  ECF 33-3.  And, as discussed, both sides submitted numerous exhibits as part of their briefing on defendants' S.J. Motion. Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss" under Rule 12(b)(6).  *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007); *see also Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013).  But, pursuant to Fed. R. Civ. P. 12(d), a district court has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion [to one for summary judgment], or to reject it or simply not consider it."  5C Wright & Miller, FED. PRAC. & PRO. § 1366, at 159 (3d ed. 2004, 2011 Supp.).  This discretion, however, "should be exercised with great caution and attention to the parties' procedural rights."  *Id.* at 149.

In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary.  *Id.* at 165-67.  If the court considers matters outside the pleadings, "the motion must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d).  But, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  *Id.*  "[T]he term 'reasonable opportunity' requires that all parties be given 'some indication by the court . . . that it is treating the 12(b)(6) motion as a motion for summary judgment, with the consequent right in the opposing party to file counter

affidavits or pursue reasonable discovery.'" *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985)

(quoting *Johnson v. RAC Corp.*, 491 F.2d 510, 513 (4th Cir. 1974)).[15]

As I described in the Factual Background, in light of plaintiff's submissions, and in light

of the substantial briefing already completed in the case, I notified the parties on November 13,

2014, of my intent to convert the pending Motion to one for summary judgment. ECF 46. In

response, in part, plaintiff's counsel submitted a Declaration asserting that, without discovery,

plaintiff cannot present facts essential to justify her opposition. ECF 47-1 ¶ 1.

A non-moving party's request for additional discovery, in the face of a motion for

summary judgment, is properly denied "where the additional evidence sought for discovery

would not have by itself created a genuine issue of material fact sufficient to defeat summary

judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995). In my

view, the additional discovery pertaining to the "areas of inquiry" identified by plaintiff's

counsel would not "affect the outcome of the suit under the governing law." *See Anderson v.*

*Liberty Lobby, Inc.*, 477 U. S. 242, 248 (1986). As discussed, *infra*, to the extent any new

evidence would relate to the elimination of McCleary-Evans's position as part of the fiscal year

2010 State budget cuts, it would not be material because defendants are entitled to legislative

immunity for actions taken in connection with the budget cuts. *See, e.g., McCray*, 741 F.3d at

---

[15] Unlike the pending Motion, defendants filed their initial motion (*i.e.*, the S.J. Motion) in the alternative – to dismiss or for summary judgment. When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998); *see Gay*, 761 F.2d at 177 ("When a party is aware that material outside the pleadings is before the court, the party is on notice that a Rule 12(b)(6) motion may be treated as a motion for summary judgment.").

486 (stating that, even "if McCray's supervisors advised the legislature to terminate her position because of discriminatory animus, this too would be protected by legislative immunity"). And, new evidence related to employment actions that occurred *before* any legislative activity would not be material, because plaintiff failed to exhaust administratively her remedies as to those claims.[16]

Indeed, as discussed, *infra*, plaintiff's claims must all be dismissed as barred by one defense or another, *i.e.*, applicable immunities, statutes of limitations, or failure to exhaust administratively. As to each of these defenses, the facts are undisputed and defendants prevail as a matter of law.

Accordingly, no further discovery is warranted, and the case is ripe for final adjudication. Therefore, under Rule 12(d), with regard to plaintiff's remaining claims under Title VII, the MFEPA, ADA Title I, and the Rehab Act, I will deny the request for discovery and convert defendants' Motion to one for summary judgment, and resolve it pursuant to Fed. R. Civ. P. 56.

### C. Fed. R. Civ. P. 56

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S.

---

[16] This point distinguishes McCleary-Evans's request from the request presented in *McCray*. In *McCray I*, believing that McCray was claiming only discriminatory discharge, I held that legislative immunity barred all of plaintiff's claims. Thus, although McCray requested additional discovery, I determined that additional discovery would not affect the outcome under governing law. However, the Fourth Circuit held that additional discovery should have been afforded, because McCray had other potential claims, relating to conduct that occurred before any legislative activity began, that were not barred by legislative immunity. Here, it is clear that McCleary-Evans's pre-legislative immunity claims are barred because they are outside the scope of her EEOC Charge.

317, 322-24 (1986).  The non-moving party must demonstrate that there are disputes of material

fact so as to preclude the award of summary judgment as a matter of law.  *Matsushita Elec.*

*Indus. Co. v. Zenith, Radio Corp.*, 475 U.S. 574, 586 (1986).

The Supreme Court has clarified that not every factual dispute will defeat the motion.

"By its very terms, this standard provides that the mere existence of *some* alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).  A fact is "material" if

it "might affect the outcome of the suit under the governing law." *Id.*  There is a genuine issue as

to material fact "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Id.*; *see Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir.

2012).

"A party opposing a properly supported motion for summary judgment 'may not rest

upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts'

showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club,*

*Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 514

U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322-24.  In resolving a summary judgment

motion, a court must view all of the facts, including reasonable inferences to be drawn from

them, in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co.*, 475

U.S. at 587; *see also Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor and City*

*Council of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013); *FDIC v. Cashion*, 720 F.3d 169, 173

(4th Cir. 2013).  The "judge's function" in reviewing a motion for summary judgment is not "to

weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material fact precludes summary judgment. *Anderson*, 477 U.S. at 248; *see Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Notably, in considering a summary judgment motion, the court may not make credibility determinations. *Jacobs v. N.C. Administrative Office of the Courts*, __ F.3d ___, No. 13-2212, slip op. at 12 (4th Cir. March 12, 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black v. Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See, e.g.*, *Boone v. Stallings*, 583 F. App'x 174, 176 (4th Cir. Sept. 11, 2014) (per curiam).

## IV. Discussion

## A. ADEA

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the

United States by Citizens of another State, or by Citizens or subjects of any Foreign State."  The Eleventh Amendment did not *create* sovereign immunity; rather, it *preserved* the sovereign immunity that the states enjoyed prior to the formation of the Union.  *See Alden v. Maine*, 527 U.S. 706, 724 (1999); *see also Sossamon v. Texas*, ⸺ U.S. ⸺, 131 S. Ct. 1651, 1657-58 (2011).

Sovereign immunity precludes a private individual from suing an unconsenting state or an instrumentality of a state (also referred to as an "arm of the state") in federal court, absent waiver or a valid Congressional abrogation of sovereign immunity.  *See Coleman v. Ct. of Appeals of Md.*, ⸺ U.S. ⸺, 132 S. Ct. 1327, 1333 (2012) ("A foundational premise of the federal system is that States, as sovereigns, are immune from suits for damages, save as they elect to waive that defense."); *Bd. of Trustees of Univ. of Ala. v. Garett*, 531 U.S. 356 (2001); *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 54-55 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States was not contemplated by the Constitution when establishing the judicial power of the United States.") (internal quotation marks and citation omitted); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."); *see also Bland v. Roberts*, 730 F.3d 368, 389 (4th Cir. 2013).  The preeminent purpose of state sovereign immunity is to accord states the dignity that is consistent with their status as sovereign entities.  *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002).

Sovereign immunity is effectively jurisdictional.  *See*, *e.g.*, *McCray*, 741 F.3d at 483; *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 482 (4th Cir. 2005). As indicated, under the Eleventh Amendment, "an unconsenting State is immune from suits brought in federal courts by her own citizens."  *Edelman v. Jordan*, 415 U.S. 651, 663 (1974). "This protection extends to state agencies."  *McCray*, 741 F.3d at 483.

Defendants correctly contend that sovereign immunity bars McCleary-Evans's ADEA claims.  ECF 33-1, Memo at 7.  "Sovereign immunity has not been abrogated for ADEA claims … ."  *McCray*, 741 F.3d at 483 (citing *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62 (2000)). "Therefore, absent abrogation of sovereign immunity or consent from Maryland," McCleary-Evans "cannot seek injunctive or monetary relief from the MDOT or MTA."  *McCray*, 741 F.3d at 483 (citing *Garrett*, 531 U.S. at 363-64).  McCleary-Evans's ADEA claims must be dismissed.

### B. Title VII

### 1. Claim for Discriminatory Discharge

Plaintiff's claim for discriminatory discharge is barred by the doctrine of legislative immunity.  Indeed, McCleary-Evans's claim that defendants violated Title VII when they abolished her position as part of the fiscal year 2010 State budget cuts is materially indistinguishable from claims by the plaintiffs in *McCray*, *Dale*, and *Walker-Pittman*. As stated in the Factual Background, plaintiff does not dispute, and defendants have amply demonstrated, that McCleary-Evans's position, *i.e.*, "Administrator IV," with the "Essential Function" of "Safety Claims Mgt," was in fact abolished as part of the 2010 budget cuts.  *See* Part II(B), *supra*.

As also described in the Factual Background, plaintiff attempts to generate a dispute of fact by way of the recently submitted Declaration of Charles Brown (ECF 51-1).  Specifically, Charles Brown disputes Anthony Brown's assertion that he, Anthony Brown, personally identified McCleary-Evans's position for elimination.  ECF 51-1 ¶¶ 9, 11.  But, this is a red herring.  Under the circumstances here, it does not matter who identified McCleary-Evans's position for elimination because where, as here, "an employee's job position is eliminated by operation of a budget cut, the employee may not evade legislative immunity by invoking discriminatory animus on the part of individuals who merely recommended elimination of the position."  *McCray I*, 2013 WL 210186, at *13.  In *McCray*, the Fourth Circuit said, 741 F.3d at 485:  "[J]ust as a legislator is immune from discrimination lawsuits when she makes budget decisions based on improper animus, aides to that legislator are also immune.  Legislative immunity is a shield that protects despicable motives as much as it protects pure ones.  For this reason, the district court's conclusion is correct insofar as it shields the MTA and MDOT from lawsuit based on the counsel they gave executive officials in Maryland who carried out the budget cuts."  Thus, defendants are immune from suit for the abolition of plaintiff's position, regardless of who first identified her position for elimination.

In sum, plaintiff's claim that defendants violated Title VII when they abolished her position, and defendants' arguments that their actions were protected by legislative immunity, hinge on undisputed material facts that are indistinguishable from those presented in *McCray I*.  Accordingly, this case can come out no differently.

Therefore, for the reasons described in *McCray I*, 2013 WL 210186, at *9-17, and as affirmed by the Fourth Circuit, *McCray*, 741 F.3d at 485, defendants are entitled to summary

judgment, as a matter of law, with respect to McCleary-Evans's claim arising out of actions taken by defendants in connection with the fiscal year 2010 State budget cuts (*i.e.*, her discharge).  The claim is barred by legislative immunity.

## 2. Remaining Title VII Claim

Under the Fourth Circuit's holding in *McCray*, 741 F.3d at 487, any discriminatory acts alleged to have occurred "before any legislative activity began" are not barred by legislative immunity.  However, McCleary-Evan's remaining Title VII claim, which pertains to acts alleged to have occurred before legislative activity began (*i.e.*, her transfer), must be dismissed under Fed. R. Civ. P. 12(b)(1) because this Court lacks subject matter jurisdiction to consider it.  As defendants observe, ECF 33 at 13-15, and as is clear from McCleary-Evans's EEOC Charge, McCleary-Evans failed to exhaust administrative remedies with regard to her transfer.  Allegations before a federal court that did not appear in a charge before the EEOC must be dismissed for lack of subject matter jurisdiction.

Title VII requires a potential plaintiff to file a charge with the EEOC before filing suit in a federal court.  42 U.S.C. § 2000e-5(f)(1) (2006) (permitting civil suit by the "person claiming to be aggrieved" after filing of a charge with the EEOC and upon receipt of a right-to-sue letter); *see also*, *e.g.*, *Puryear v. Cnty. of Roanoke*, 214 F.3d 514, 518 (4th Cir. 2000) ("[T]he aggrieved person may initiate a civil action based on the Title VII claims made in her EEOC charge only after receipt of a right-to-sue letter."); *Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005). This "exhaustion requirement ensures that the employer is put on notice of the alleged violations so that the matter can be resolved out of court if possible."  *Miles*, 429 F.3d at 491.

The exhaustion requirement is not "simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit." *Chacko v. Patuxent Institution*, 429 F.3d 505, 510 (4th Cir. 2005). Rather, together with the agency investigation and settlement process it initiates, the requirement "'reflects a congressional intent to use administrative conciliation as the primary means of handling claims, thereby encouraging quicker, less formal, and less expensive resolution of disputes.'" *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 407 (4th Cir. 2013) (quoting *Chris v. Tenet*, 221 F.3d 648, 653 (4th Cir. 2000)).[17] "Allowing [the EEOC] first crack at these cases respects Congress's intent … ." *Sydnor v. Fairfax Cnty.*, 681 F.3d 591, 593 (4th Cir. 2012).

Title VII's exhaustion requirement also functions as a jurisdictional bar in federal courts where plaintiffs have failed to meet it. In *Balas*, 711 F.3d at 406, the Court said: "[F]ederal courts lack subject matter jurisdiction over Title VII claims for which a plaintiff has failed to exhaust administrative remedies." Even when, as here, a plaintiff has filed a claim with the EEOC, a court cannot consider matters that were not properly raised during the EEOC process. *See, e.g.*, *Jones v. Calvert Group*, 551 F.3d 297, 300 (4th Cir. 2009) (quoting *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996)) ("'Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit.'"); *Miles*, 429 F.3d at 491.

To determine whether a plaintiff has "properly alleged [a claim] before the EEOC" in a manner satisfying the exhaustion requirement, courts "may look *only* to the charge filed with that

---

[17] For a description of the full process, *see Balas*, 711 F.3d at 407.

agency." *Balas*, 711 F.3d at 408 (emphasis added); *see also Evans*, 80 F.3d at 962-63 ("The allegations contained in the administrative charge of discrimination generally operate to limit the scope of any subsequent judicial complaint."); *Chacko*, 429 F.3d at 506 ("This charge frames the scope of future litigation."). Courts may not look to a plaintiff's intake questionnaire, *Balas*, 711 F.3d at 408, or to other letters sent to the agency, *id.*; *see also Sloop v. Mem'l Mission Hosp., Inc.*, 198 F.3d 147, 149 (4th Cir. 1999) (holding that plaintiff's letters to the EEOC did not amend the charge and could not be considered in exhaustion analysis). Limitation of judicial review to a plaintiff's formal charges ensures that the administrative process functions as Congress intended, by clarifying and documenting a claimant's concerns, providing notice to affected employers, and enabling informal resolution of the dispute. *See Balas*, 711 F.3d at 408; *Sloop*, 198 F.3d at 149.

Although courts "recognize that EEOC charges often are not completed by lawyers and as such must be construed with utmost liberality," courts are "not at liberty to read into administrative charges allegations they do not contain." *Balas*, 711 F.3d at 408 (citations and quotation marks omitted). Rather, courts are constrained by the four corners of the charge and the inference of "'any charges that would naturally have arisen from an investigation thereof … .'" *Balas*, 711 F.3d at 407-08 (citations omitted); *see also Sydnor*, 681 F.3d at 594 ("[A]n administrative charge of discrimination does not strictly limit a Title VII suit which may follow. Instead, so long as a plaintiff's claims in her judicial complaint are reasonably related to her EEOC charge and can be expected to follow from a reasonable administrative investigation, she may advance such claims in her subsequent civil suit.").

Significantly, "[a] plaintiff fails to exhaust his [or her] administrative remedies where … [the] administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in [a] formal suit." *Chacko*, 429 F.3d 506; *accord Sydnor*, 681 F.3d at 593.   Here, the only employment practice alleged in McCleary-Evans's EEOC Charge involved the elimination of her State position from the State budget.   EEOC Charge, ECF 44-2 at 3.   In relevant part, she stated:   "I began working for the above named employer in July 2006 as an Administrator IV.   On or about August 25, 2009, I was informed that my position would be abolished effective October 1, 2009. … The employer stated my position was abolished because of budgetary constraints."   *Id.*   Clearly, the EEOC Charge does not mention plaintiff's earlier job transfer.

Moreover, the EEOC Charge does not provide any other details that would direct a reasonable investigation to consider whether her transfer in September 2008 occurred for discriminatory reasons.   For example, it does not identify any specific actor or actors who committed the alleged discrimination.   It does not set a timeframe for the investigation.   The "Date(s) Discrimination Took Place" provides August 25, 2009, as both the "Earliest" and "Latest" date.   *Id.*

The factual allegations in the EEOC Charge suggest a timeframe that begins at the beginning of defendants' fiscal year 2010 State budget recommendations process.   Plaintiff's transfer occurred before that process began and was therefore outside even the suggested timeframe.   Thus, it is also clear that the allegations in McCleary-Evans's complaint pertaining to her transfer "reference different time frames … and discriminatory conduct" than those included in her EEOC Charge (and neither identified a responsible actor).   *See Chacko*, 429 F.3d

at 508.  Consequently, plaintiff's current claim for discriminatory transfer would not "naturally

have arisen from an investigation" of her discriminatory discharge claim.  *See Balas*, 711 F.3d at

407-08.

It is worth noting that McCleary-Evans has provided strong evidence that she carefully

considered the contents of her "perfected charge," and that it accurately reflected her concerns.

As discussed in the Factual Background, she submitted multiple batches of supplementary

documentation regarding her possible claims to the EEOC administrator.  *See* ECF 16-2 at 2, 3,

7.  And, she engaged in a dialogue with the investigator about the viability of her claims.

Although the evidence does not speak to plaintiff's exchange with the investigator, if any,

regarding her prior job transfer, it does show that plaintiff expressly rejected some of the

investigator's recommendations, *i.e.*, that plaintiff drop her race and sex claims.  *See id.* at 2.

Plaintiff also amended her EEOC Charge, after reviewing the facts, to include disability.  *Id.* at

18.  But, she did not include her job transfer.

Additionally, as late as April 2013, in her first Declaration submitted to this Court,

plaintiff averred that Anthony Brown transferred her to the Office of Safety "to protect and

accommodate Mr. Newton's desire not to work with [her]."  ECF 14-1 ¶ 25.  That does not

sound like an allegation that Brown transferred plaintiff because, on the basis of her race, sex, or

prior protected civil rights activity, he intended to set her up to be fired nearly a year later.

In sum, it appears that plaintiff's EEOC Charge accurately reflects what has been the

gravamen of her complaint all along, *i.e.*, that someone within the MTA or MDOT used the

budget cuts to abolish positions filled by African-American women, over the age of forty, many

of whom have disabilities and/or had engaged in protected civil rights activity, *because* she and

others similarly situated had those protected characteristics.  *See* ECF 44-2 at 3 (EEOC Charge); ECF 1 at 2; ECF 31 at 2.

Accordingly, I must dismiss McCleary-Evans's remaining Title VII claim for failure to exhaust, resulting in a lack of subject matter jurisdiction.  *See Evans*, 80 F.3d at 963-64 (barring claim where administrative charge alleged failure to promote, and the claim included allegations of discrimination in pay and benefits); *Dennis v. Cnty. of Fairfax*, 55 F.3d 151, 153, 156-57 (4th Cir. 1995) (holding allegations of a discrete act in an administrative charge are insufficient when the plaintiff subsequently alleges a broader patter of misconduct); *Lawson v. Burlington Indus., Inc.*, 683 F.2d 862, 863-64 (4th Cir.) (barring claim of discriminatory failure to rehire because charge only alleged illegal layoff), *cert. denied*, 103 S. Ct. 257 (1982).

### C. MFEPA

McCleary-Evans has also added a claim that defendants violated the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code (2009), § 20-606(a)(1)(i) of the State Government Article ("S.G."), for "Unlawful employment practices."  ECF 31 at 2.

Under Fed. R. Civ. P. 15(c)(1), an "amendment to a pleading relates back to the date of the original pleading when: (A) the law that provides the applicable statute of limitations allows relation back; (B) the amendment asserts a claim or defense that arose out of the conduct … set out — or attempted to be set out — in the original pleading; or (C) the amendment changes the party or the naming of the party against whom a claim is asserted … ."  Even assuming that, under Fed. R. Civ. P. 15(c)(1), plaintiff's amendment relates back to her original Complaint, plaintiff's State claims are barred by the applicable State statute of limitations.

The MFEPA "is the state law analogue of Title VII." *Alexander v. Marriott Int'l, Inc.*, RWT-09-02402, 2011 WL 1231029, at *6 (D. Md. Mar. 29, 2011); *see also Haas v. Lockheed Martin Corp.*, 396 Md. 469, 483 n.8, 914 A.2d 735, 743 n.8 (2007). Maryland courts interpreting MFEPA have often found federal cases arising under Title VII to be persuasive authority. *See, e.g.*, *Taylor v. Giant of Md., LLC*, 423 Md. 628, 652, 33 A.3d 445, 459 (2011); *Molesworth v. Brandon*, 341 Md. 621, 632-33, 672 A.2d 608, 614 (1996); *Chappell v. S. Md. Hosp., Inc.*, 320 Md. 483, 494, 578 A.2d 766, 772 (1990); *Edgewood Mgmt. Corp. v. Jackson*, 212 Md. App. 177, 200 n.8, 66 A.3d 1152, 1166 n.8 (2013). And, plaintiff has not asserted a distinction between her federal and Maryland discrimination claims. Accordingly, I will apply the same standards to my analysis of plaintiff's State and federal discrimination claims. *See Blakes v. City of Hyattsville*, 909 F. Supp. 2d 431, 444 (D. Md. 2012).

State statutes of limitations apply to state claims in federal courts. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). S.G. § 20-1013 provides that "a complainant may bring a civil action … alleging an unlawful employment practice, if: (1) the complainant initially filed a timely administrative charge … ; (2) at least 180 days have elapsed since the filing … ; *and* (3) the civil action is filed within 2 years after the alleged unlawful employment practice occurred." (emphasis added). The Supreme Court has held that, in the context of Title VII, "a discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.'" *Nat'l R.R. Passenger Corp. v. Morgan (Amtrak v. Morgan)*, 536 U.S. 101, 110 (2002).

Here, under both State and federal law, the most recent potentially unlawful employment practice "occurred" on August 25, 2009, when plaintiff learned her position would be abolished. *See* McCleary-Evans Decl., ECF 14-1 ¶ 29. *See also Society Without A Name*, 655 F.3d at 348

("A civil rights claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action.") (internal quotations omitted).  Thus, even if the allegations in the Amended Complaint relate back to the Original Complaint under Maryland law, plaintiff's original Complaint was filed more than two years later.  *See* ECF 1 (filed May 23, 2012).

McCleary-Evans argues in her Opposition that "the statute's two-year limitations provision has no application" because plaintiff's claims "are subject to the administrative requirement otherwise applicable to Title VII and the related administrative exhaustion requirements of … the ADEA and the ADA."  ECF 44 at 2.  Although it is true that plaintiff's MFEPA claims are subject to an administrative filing requirement, S.G. § 20-1013(a)(1), this requirement is in addition to the requirement that any "civil action" be filed "within 2 years after the alleged unlawful employment practice occurred."  S.G. § 20-1013(a)(3).

As quoted above, the statute provides three requirements, joined by the word "and," that a complainant must satisfy in order to pursue a civil action.  Under well settled principles of statutory construction, the use of the word "and" between these three requirements unambiguously commands that a complainant meet all three requirements, not just any one of them.  *Stanley v. State*, 390 Md. 175, 887 A.2d 1078 (2005), provides guidance.

In *Stanley*, the Maryland Court of Appeals considered the import of the conjunctive "and" in interpreting a statute and said, *id.* at 183-84, 887 A.2d at 1082-83:

> The definition of the illegal possession targeted for purposes of this statute … consists of two elements and is stated in the conjunctive.  … That means, since the definition includes a crime of violence *and* 'any violation classified as a felony in this State,' that a conviction of both, not just one, must be established. … Were it otherwise, we would not give the entire statute effect and, in fact, we would be rendering the conjunction, 'and,' superfluous.  Moreover, we would be adding a word, 'or,' to the statute that the General Assembly did not.  It is a well settled canon of statutory construction that we should, when interpreting a statute,

- 40 -

give effect to all of the language and avoid a construction that renders any portion superfluous.

Similarly, plaintiff's proposed interpretation of S.G. § 20-1013(a) would render the Maryland General Assembly's use of the term "and" superfluous, and would add the word "or" where "the General Assembly did not," in violation of elementary principles of statutory construction. *See* 1A Singer & Singer, SUTHERLAND STATUTES & STATUTORY CONSTRUCTION § 21:14 (6th ed. 2002) ("Where two or more requirements are provided in a section and it is the legislative intent that all of the requirements must be fulfilled to comply with the statute, the conjunctive 'and' should be used."); *see also Bourgeois v. Live Nation Ent's, Inc.*, 430 Md. 14, 27, 59 A.3d 509, 516 (2013) ("We begin with the plain language of the statute, reading it as a whole to ensure that no word, clause, sentence or phrase is rendered meaningless."). Plaintiff has offered no reason for the Court to reject the statute's plain meaning.

Thus, there is no genuine dispute of material fact that plaintiff has failed to file her MFEPA claim within two years of the most recent alleged unfair employment practice. Accordingly, McCleary-Evans's MFEPA claim is time-barred.

### D. ADA & Rehabilitation Act

Finally, McCleary-Evans's claims under Section 504 of the Rehabilitation Act and Title II of the ADA are also barred by defendants' legislative immunity and statutes of limitation.

With regard to plaintiff's claim for discriminatory discharge, plaintiff's claims under the ADA and the Rehab Act must be denied for the reasons stated earlier in my analysis under Title VII. There is no genuine dispute of material fact that plaintiff's position was abolished as part of the fiscal year 2010 State budget cuts. Accordingly, defendants are entitled to absolute legislative immunity with regard to that decision and the recommendations supporting it. *See*

*also*, *e.g.*, *Bogan v. Scott–Harris,* 523 U.S. 44, 54 (1998) (holding State actors are immune to suit under 42 U.S.C. § 1983 for claim based on legislative activity) ("Absolute legislative immunity attaches to all actions taken 'in the sphere of legitimate legislative activity' … .") (quoting *Tenney v. Brandhove,* 341 U.S. 367, 376 (1951)); *McCray*, 741 F.3d at 485 (holding State actors are immune to suit under Title VII for claim based on legislative activity); *Kobe v. Haley*, 11-01146-TMC, 2013 WL 4056335, at *5 (D.S.C. Aug. 12, 2013) (holding State actors are immune to suit under ADA Title II and the Rehab Act for claims based on legislative activity); *Am. Ass'n of People With Disabilities v. Smith*, 227 F. Supp. 2d 1276, 1297 (M.D. Fla. 2002) (same, for local actors).

With regard to plaintiff's remaining claims, *i.e.*, for discriminatory transfer, under both the ADA and the Rehab Act, these claims are also time barred.

Neither the Rehabilitation Act nor Title II of the ADA contains its own specific statute of limitations. *See Society Without A Name*, 655 F.3d at 347 (Title II of the ADA); *McCullough v. Branch Banking & Trust Co.*, 35 F.3d 127, 129 (4th Cir. 1994) (Rehabilitation Act). The catch-all federal statute of limitations, codified at 28 U.S.C. § 1658, does not apply here because plaintiff's claims arise out of provisions enacted before the adoption in 1990 of this catch-all limitation. *See Jeandron v. Bd. of Regents of Univ. of Md.*, 510 F. App'x 223, 226 (4th Cir. 2013) (applying state statute of limitations to ADA and Rehabilitation Act claims); *Society Without A Name*, 655 F.3d at 347 (holding § 1658 does not apply to Title II of the ADA and citing *Jones v. R. R. Donnelley & Sons Co.*, 541 U.S. 369, 371 (2004)). In the absence of an applicable federal standard, plaintiff's claims are governed by "the state statute of limitations that applies to the most analogous state-law claim." *Society*, 655 F.3d at 347 (citing 42 U.S.C. §

1988 and *Wilson v. Garcia*, 471 U.S. 261, 266-67 (1985)); *see also Wolsky v. Medical Coll. of Hampton Roads*, 1 F.3d 222, 223 (4th Cir. 1993) (applying most-analogous-state-law standard to Rehabilitation Act).

To determine which state-law claim is most analogous, courts look to the rights and remedies provided, *Wolsky*, 1 F.3d at 224, and the persons the law intends to protect. *McCullough*, 35 F.3d at 132.  Federal law determines when both claims began to accrue.  *See Society*, 655 F.3d at 348 (citing *Cox v. Stanton*, 529 F.2d 47, 50 (4th Cir. 1975)).  Under federal law, "[a] civil rights claim accrues when the plaintiff 'knows or has reason to know of the injury which is the basis of the action.'"  *Society Without A Name*, 655 F.3d at 348 (quoting *Cox*, 529 F.2d at 50).

Defendants contend that the MFEPA is the most analogous state-law claim to plaintiff's Rehabilitation Act claim.  ECF 33-1 at 15-16.  "MFEPA," defendants argue, "similar to the Rehabilitation Act, prohibits discrimination in employment because of an individual's disability and provides for an individual private right of action."  *Id.*  Thus, MFEPA's two-year statute of limitations, S.G. § 20-1013(a), should also apply.  *Id.*  Defendants further note that an unreported Fourth Circuit opinion, issued in 2013, applied a general three-year statute of limitations, and did not involve amendments to Maryland law made in 2007.  *See Jeandron*, *supra*, 510 F. App'x 223.  Rather, the "opinion relied exclusively on federal District of Maryland cases that were decided *before* 2007, the year in which Maryland amended its civil rights statute to create a private right of action for employment discrimination, and those opinions analyzed only the six-month statute of limitations for filing an administrative complaint in MFEPA's predecessor statute … ."  ECF 37-1 at 16 (emphasis in original).  In any event, defendants assert that

plaintiff's remaining Rehab Act and ADA claims are time-barred under either a two-year or three-year limitations period.  *See* ECF 33-1 at 17-18; ECF 45 at 4 n.1.

Plaintiff responds that her "disability discrimination claim under Section 504 of the Rehabilitation Act is subject to a 3-year, not a 2-year limitations period, and that claim is not, therefore, time-barred."  Opposition, ECF 44 at 2.

Defendants are correct that plaintiff's claims are time-barred under either a two-year or three-year statute of limitations.  There is no genuine dispute of material fact as to this issue.

As defendants observe, *see* ECF 33-1 at 17-18; ECF 45 at 4 n.1, the most recent alleged discriminatory act that is not barred by legislative immunity was plaintiff's transfer.  Plaintiff learned of her transfer on September 19, 2008.  ECF 14-1 ¶ 24.  Even assuming the claims raised in plaintiff's Amended Complaint relate back to the date of her original Complaint under Fed. R. Civ. P. 15(c)(1), plaintiff's Complaint was filed on May 23, 2012.  That filing was more than three years after September 19, 2008.  *See* ECF 1.  Thus, I need not decide whether Maryland's general statute of limitations applies, as many courts in this Circuit have held, *see*, *e.g.*, *Jeandron*, 510 F. App'x at 226 (applying general limitation to Rehabilitation Act and ADA claims and citing prior decisions), or whether MFEPA's limitation period applies, as defendants urge.  Plaintiff's claims for discriminatory transfer under the Rehab Act and ADA Title II are time-barred either way.

**Conclusion**

For the foregoing reasons, I will dismiss, under Fed. R. Civ. P. 12(b)(1), plaintiff's ADEA claims and her Title VII claim that relates to conduct other than her discharge.  As to the remainder of plaintiff's claims, I will grant summary judgment to defendants.

A separate Order follows, consistent with this Memorandum.


Date: March 20, 2015                          _____/s/_____

                                             Ellen Lipton Hollander
                                             United States District Judge